United States Fidelity & Guaranty Company v.
Maxwell.

Opinion delivered February 20, 1922.

1.  Insurance—Warranties in applications.—A mere reference in an insurance policy to the application does not constitute a warranty, even though the application itself states that the truth of its

statements shall constitute a warranty; the reason being that the policy itself is the evidence of the contract, and must either contain the warranty or by proper reference incorporate therein the application which contains it.

2. INSURANCE—INCORPORATING WARRANTY IN POLICY.—A policy of guaranty insurance will be held to warrant statements in the application to be true where it refers to the application and provides that the representations and promises therein "are hereby expressly warranted to be true."

3. INSURANCE—PROMISSORY WARRANTY—BREACH.—Where an application by a bank for guaranty insurance stipulated that an examination of applicant's accounts would be made once or twice a year by some reputable auditing firm "outside of the audit of the State or National Bank Examiners," and such stipulation was made a warranty, proof that no other audits were made after the State Banking Department began making audits established a breach of warranty.

4. INSURANCE—BREACH OF WARRANTY—WAIVER.—The basis of the rule that a request for further proofs of loss is a waiver of forfeiture is that the forfeiture must be known at the time; the mere fact that it could have been known by diligent inquiry not being sufficient.

5. SET-OFF AND COUNTERCLAIM—WAIVER.—One sued by the Bank Commissioner as receiver of an insolvent bank does not lose his right to set-off a claim against the bank by presenting the claim to the chancery court in the proceeding wherein the affairs of the bank were wound up.

6. BANKS AND BANKING—LIABILITY OF BANK COMMISSIONER.—Rights capable of assertion against an insolvent bank may be asserted against the Bank Commissioner on his being appointed receiver to wind up its affairs.

7. SET-OFF AND COUNTERCLAIM—INSOLVENT BANK—PREFERENCE.— Since to permit a debtor of an insolvent bank to offset a claim assigned to it after the bank passed into the receiver's hands would be allowing a preference against an insolvent corporation, which is forbidden by Crawford & Moses' Digest, § 1798, *held* that where the Bank Commissioner, as receiver of an insolvent bank, sued a guaranty company on the fidelity bonds of two of its employees, defendant was not entitled to offset the amount of a deposit in the bank which it had guaranteed to the depositor, and had paid to him after the bank's insolvency. taking an assignment of the depositor's claim.

Appeal from Mississippi Chancery Court, Chickasawba District; *Archer Wheatley,* Chancellor; reversed.

*Block & Kirsch* and *Joseph H. Norville,* for appellant.

The terms of the policy made the employer's statement a part thereof. 4 Ark. 251; 26 Ark. 249; 89 Ark. 239; 127 Ark. 535; 18 Ark. 65; 45 Ark. 17; 49 Ark. 320; 94 Ark. 90. The representations and promises therein were warranties. 80 Ark. 49; 89 Ark. 481; 105 Ark. 115; 236 Ill. 444; 19 L. R. A. (N. S.) 88. A warranty is a matter of contract, must appear from the contract itself, and show that it was the intent of the parties to warrant. 58 Ark. 532; 66 N. C. 70; Metc. (Mass.) 114; 35 Conn. 225; 69 Mass. 580.

The warranties and covenants relied on by appellant are not in contravention of substantive or statutory law, 183 U. S. 402; 176 S. W. 368.

The breach of the promissory warranty to audit voided the bonds. 58 Ark. 277; 53 Ark. 753; 61 Ark. 207; 57 Ark. 279; 87 Ark. 349; 74 Ark. 603.

The bonds were voided by the retention of the employees after knowledge of their peculations; by the failure of the bank to notify the surety upon discovering acts capable of giving rise to a claim; and by not making claim within the time specified in the bond. 108 U. S. 402; 224 Fed. Rep. 866; 67 So. 318.

The bonds were void because of the misrepresentations of the bank in stating and warranting that the accounts of the applicants were correct. 36 Me. 179; 10 Bush (Ky.) 23.

The failure of the bank to notify the surety that audits had not been made voided all renewals of the policies.

*Driver & Simpson* and *Moore, Smith, Moore & Trieber,* for appellee.

The employer's statements were not copied into the bonds, nor attached to same, nor do the bonds contain express stipulations that they were part of the bonds,

and therefore can be nothing but representations, and were in no sense warranties. 133 Ark. 348; 236 Ill. 444; 105 Ark. 101.

The knowledge of Sudbury was not such as required the bank to give notice to the surety, as he was in no sense aware of the wrongdoing of the officers accused. 118 Iowa 729; 92 N. W. 686; 170 U. S. 160; 186 U. S. 342; 154 Fed. 545; 200 Fed. 675; 38 S. E. 908.

Appellant waived whatever grounds of forfeiture it otherwise had by calling upon the appellee for further proofs after discovery, or opportunity to discover, the forfeiture. 53 Ark. 494; 67 Ark. 584; 14 R. C. L. (Ins.) par. 376. It either had the information of the forfeiture, or else it intentionally acted without such knowledge, which is the same in legal effect, in sending the telegram, the effect of which was that appellant was ready to settle upon being advised of the value of the property turned over to the bank by the defaulting officers. 114 Md. 130, 91 Atl. 753; 121 Mich. 591; 80 N. W. 573; 72 Iowa 261; 33 N. W. 663; 117 Pa. 492; 35 Atl. 612.

Appellant having elected to reduce its claim, arising from its bond to the Mo. State Life Ins. Co., to a judgment in the administration of the affairs of the bank, can not rightfully be permitted to disregard such judgment and claim the residue of the amount for which it has received no payment, as a set-off against a judgment under its bonds to the bank.

*Block & Kirsch* and *Joseph H. Norville,* for appellant. in reply.

The rights of third parties are not affected by the appointment of a receiver of a banking corporation. 98 Ark. 200; 138 Ark. 38. The indebtedness of a bank to a depositor can be set-off in full against his indebtedness to the bank. 98 Ark. 294; 141 Ark. 16; 134 Ark. 311.

In order that there may be an election of remedies, a party must have two or more such remedies. Here the

appellant only had one, which was to prove its claim against the bank. Sec. 3 C. J., Election of Remedies, pgs. 5, 21 and 26.

The employer's statements need not be physically attached to the bond.

There can be no waiver without knowledge of the facts. 53 Ark. 494; 67 Ark. 584; 14 R. C. L. par. 376; 112 Ark. 176; 87 Ark. 326.

McCulloch, C. J. This is an action on two policies of insurance issued by appellant company, whereby the company undertook to reimburse to the assured such pecuniary loss as might be sustained by the assured by reason of the fraud or dishonesty of two of its employees in connection with their respective duties amounting to embezzlement or larceny. The bonds were each in the sum of $10,000, and were issued to the Bank of Blytheville, a banking institution doing business at Blytheville, Arkansas, the undertaking being to reimburse for loss caused by the misconduct of B. H. Wilhite and W. O. Anthony, respectively, the cashier and assistant cashier of the bank.

The original bonds were issued and dated March 17, 1914, to cover a period of one year, and were renewed from time to time under the same terms and stipulations. The bank was found to be insolvent, and was taken over by the Bank Commissioner on March 11, 1920, while the last renewal was in force, and this action was instituted by the Bank Commissioner as receiver. The action was commenced in the circuit court, but on motion of appellant and without objection it was transferred to the chancery court, where it proceeded to a final decree.

An audit of the books of the bank and an examination of its affairs disclosed the fact that at the time of the failure Wilhite and Anthony were short in their accounts in the sum of $896,244.96, and were indebted to the bank in that sum. The items of the defalcation consisted of overdrafts of those parties in the sum of $607,-526.65, promissory notes in the sum of $19,800, and cer-

tain other items consisting of unreported collections from other banks, bills payable, time deposits and cash, all aggregating $268,919.41. Subsequently, Wilhite and Anthony turned over to the Bank Commissioner, on their indebtedness to the bank, property of the estimated value of $216,000, leaving a shortage of approximately $680,000.

The application for the policies, which was signed by Mr. Sudbury, the president of the bank, contained the following statements:

### "EMPLOYER'S STATEMENT.

"For completion by proper officer on behalf of the employer, the company desires to have answers to the following questions, and the answers will be taken as the basis of the bond if issued.
* * * *

"Will any examination of the applicant's accounts be made outside of the audit of the State or National Bank Examiners?

"Yes.

"How frequently will this examination be made, and by whom?

"Once or twice each year by some reputable auditing firm.
* * * *

"Are the applicant's accounts correct in every respect at this date?

"Yes.

"Will the applicant authorize the loans and discounts of the bank?

"No.
* * * *

"It is agreed that the above representations are to be taken as the basis of the said bond applied for, or any renewal or continuation of the same that may be issued by the United States Fidelity & Guaranty Company to the undersigned on behalf of the applicant herein."

The policy also contained the following introductory clause:

"Whereas, the employer has heretofore delivered to the company certain representations and promises relative to the duties and accounts of the employee, and other matters, it is hereby understood and agreed that those representations and such promises, and any subsequent representation or promise of the employer, hereafter required by or lodged with the company, are hereby expressly warranted to be true."

The defense offered by appellant and sought to be maintained in the trial of the cause was that the statements contained in the application were warranties, and that there was a breach of the warranty with respect to the truth of each of the questions set forth. The first question, therefore, presented for our consideration is, whether the statements in the application were warranties or mere representations.

The distinction between warranties in a contract and mere misrepresentations which induce the execution thereof—what constitutes the one or the other, and what is the legal effect of each—is well understood and too well settled by the decisions of this court to need further comment. *Providence Life Assurance Society* v. *Reutlinger,* 58 Ark. 528. It has been decided by this court that a mere reference in a policy to the application does not constitute a warranty, even though the application itself contains a statement that the truth of the statements shall constitute a warranty. The reason for this rule is that the policy itself is the last word between the contracting parties and should be the evidence of the extent of the contract. *Metropolitan Life Ins. Co.* v. *Johnson,* 105 Ark. 101; *Southern Surety Co.* v. *Barham,* 133 Ark. 220; *American Life & Accident Assn.* v. *Walton,* 133 Ark. 348. The policy itself must contain an express warranty or by proper reference must incorporate therein the application which contains it, otherwise the statements in the application are deemed to be mere representations.

*American Life & Accident Assn.* v. *Walton, supra; Spence* v. *Central Accident Ins. Co.* 236 Ill. 444. Measured by this rule, the language of the policy in the present case is sufficient to constitute a warranty of the truth of the statements and stipulations in the application. The clause in the policy which we have quoted specifically refers to the application and expressly provides that the representations and promises therein "are hereby expressly warranted to be true." It is difficult to conceive of more definite language expressing the contract to be that the representations and promises shall be warranties.

It is conceded that no attempt was made to comply with the promise in the application that an examination of the accounts would be made "once or twice each year by some reputable auditing firm." The only witness who testified on that subject said that soon after the policies were issued the State Banking Department began making audits, and it was deemed unnecessary to have any further audits made. This was in violation of the contract, for the stipulation was that these audits would be made in addition to those made by "State or National bank examiners." This breach of warranty was sufficient to defeat recovery unless the forfeiture was waived.

It is unnecessary to discuss the question of other breaches of warranty or failure to perform the conditions with respect to prompt notice of defalcations prior to the time the affairs of the bank passed into the hands of the Bank Commissioner.

Appellant was notified by the Commissioner immediately after he took charge, and appellant's agents and officers began an investigation to determine the extent of the defalcation.

It is claimed on behalf of appellee that appellant waived the forfeiture arising from breach of warranty by calling upon the Bank Commissioner for further proofs after discovery of the forfeiture. This claim is based upon the correspondence between Mr. Hall, the Memphis agent who had charge of the matter, and Mr. Trieber, one

of the attorneys for the Bank Commissioner, residing in the city of Little Rock. In a telegram dated August 12, 1920, Hall inquired what property Wilhite and Anthony turned over, the valuation thereof and the application of same, and stated that he would be ready to "dispose of the bank claim" when the information was furnished. Shortly thereafter a statement was made up from the office of the Bank Commissioner giving the desired information, and the same was forwarded to appellant's agent, Mr. Hall.

There is no proof in the record tending to show that the company knew of the breach of warranty with respect to the failure to audit the accounts when this communication took place. On the contrary, Hall testified that the first information he had in regard to the breach of warranty was in a letter received in October, 1920. It has been often held by this court that a request for further proofs of loss constitutes a waiver of known forfeitures, but the basis of this rule is that the forfeiture must be known at the time, the mere fact that it could have been known by diligent inquiry is not sufficient. *German Ins. Co.* v. *Gibson,* 53 Ark. 494; *Planters' Mut. Ins. Co.* v. *Loyd,* 67 Ark. 584; *Patterson* v. *Equitable Life Assurance Society,* 112 Ark. 171. Proof on this question does not seem to have been fully developed in the trial below, and, instead of dismissing the complaint, the cause will be remanded with leave to the parties to take further proof on the issue whether or not appellant or its agent had knowledge of the forfeiture at the time further proofs were called for in the communication of Mr. Hall to the attorney for the Bank Commissioner.

There is another feature of the case which calls for discussion. At the time of the failure of the Bank of Blytheville, the Missouri State Life Insurance Company had on deposit in said bank the sum of $1,660.86 and held a policy of insurance issued by appellant, whereby appellant undertook to indemnify said depositor against loss of the deposits not in excess of $2,000. Appellant paid the

loss to the Missouri State Life Insurance Company and took an assignment of the claim against the bank and filed it for allowance. Pursuant to the order of the chancery court, a dividend of 15 per centum was declared in favor of all claimants against the bank, and a check was sent to appellant for the sum of $241.13, as its *pro rata* under the claim filed. The check was received by appellant, but had not been cashed up to the time of the trial of this cause. Appellant presented a counterclaim in this action for the amount of $1,660.86 due on the claim, and the court allowed it, as a set-off against appellee's claim under the policy sued on. Appellee has cross-appealed from that part of the decree allowing the set-off. The reason urged by counsel for appellee why this feature of the decree should be reversed is that appellant had elected to present its claim to the chancery court for allowance in the proceedings wherein the affairs of the bank were wound up, and that the amount was allowed there. This did not, however, constitute an election not to claim the amount in other proceedings. If appellant was entitled to counterclaim this amount, or to assert it as a set-off in the action brought on the bond, it did not waive that right by presenting the claim to the chancery court for allowance. It had a right to present its claim there independently of any other litigation then pending or which might subsequently arise. *Rivers v. House,* 150 Ark. 452. The Missouri State Life Insurance Company was a creditor of the bank to the extent of its deposit, and it assigned its claim to appellant, who succeeded to the rights of the depositor. If the bank, before its failure, had instituted this action on the bond, appellant would have had the right to set-off the debt which the bank owed to its depositor, and the Bank Commissioner as receiver, in taking charge of the affairs of the bank, merely took the place of the bank, and rights capable of assertion against the bank were not displaced or abrogated by the appointment of the receiver. *Jordan v. Harris,* 98 Ark. 200; *Funk v. Young,* 138 Ark. 38.

The law is well settled that where there is a statute prohibiting preferences in claims against insolvent corporations, claims acquired after insolvency or after the appointment of a receiver cannot be set-off against debts owing to the corporation in the hands of the receiver for collection, for, if the law were otherwise, the statute against preferences could be defeated by the purchase of outstanding claims and having them allowed in full as a set-off. The right of set-off exists only to the extent of the concurrence of the two claims, and in case of insolvency proceedings under a statute prohibiting preferences the concurrence of claims must have existed before the insolvency occurred and the proceedings were instituted. 34 Cyc. 194-198; *Miller* v. *Audenried,* 67 N. J. E. 252; *Smith* v. *Mosby,* 9 Heisk. (Tenn.) 501. Such is the effect of our decision in the case of *Funk* v. *Young, supra.* In that case a depositor in an insolvent bank sought to set-off his claim against his own liability to the bank on a promissory note, and we held that he was entitled to do so on the ground that his right to set-off existed at the time that the affairs of the bank passed into the hands of the receiver, and that the right was still intact. The converse of that doctrine is that, if his right of set-off did not exist at the time the receiver took charge, he could not have acquired the right.

The question then arises whether appellant's claim against the bank arose prior to the insolvency of the bank or the taking over of its affairs by the Commissioner. Our conclusion is that the claim in favor of appellant did not arise until after the Bank Commissioner took possession of the insolvent bank, and that the claim is not available as a set-off against appellant's liability under the bond.

In the transaction between appellant and the Missouri State Life Insurance Company there was no privity of contract between appellant and the Bank of Blytheville. Appellant had no claim against the Bank of Blytheville and never acquired any claim until it made good its contract of indemnity after the Bank Commissioner took pos-

session of the affairs of the bank. There was no concurrence between the respective claims of the Bank Commissioner, as receiver, under the bond sued on, and the claim which appellant acquired by complying with its contract of indemnity with the Missouri State Life Insurance Company. Appellant was not a surety for the bank, but was a mere guarantor or insurer of the Missouri State Life Insurance Company against loss. Appellant took an assignment of the claim when it paid to the Missouri State Life Insurance Company the amount of the deposit, but, if we treat appellant as being entitled to the right of subrogation without a formal assignment of the debt, it is in no better attitude to claim the right of set-off, for, as we have already stated, there was no privity of contract between the bank and appellant prior to such payment, and, in the absence of a formal assignment of the debt, the payment of the amount was tantamount only to an equitable assignment. The right of subrogation carries with it all the securities held by the original claimant, but this does not extend to the right to set-off a claim which the party entitled to subrogation did not own prior to that time.

If appellant be allowed to set-off this claim, the effect would be to give it a preference on a claim against the bank acquired subsequent to the time that the bank became insolvent and passed into the hands of the receiver.

Our attention is called to the decision of the Supreme Court of Oregon in the case of *County of Wasco* v. *New England Equitable Insurance Company* (L. R. A. 1918-D, 732), announcing a doctrine which is said to be controlling in the present case in favor of allowing appellant's set-off. We do not think that case has any bearing on the present one, whether it was decided right or wrong. That case involved the right of a surety to subrogation to the funds held by the obligee in the bond of suretyship, and the court held that there was a right of subrogation as against a prior assignment of the funds by the principal debtor. The statement in that case of the general principles of law in regard to the doctrine of subrogation is undoubtedly

correct, but we think it has no application to a case like the present one, where there was no privity of contract between the parties now before the court until the acquisition of the claim by the payment of the debt to the insurance company.

The decree is therefore reversed and the cause is remanded, with directions to dismiss the counterclaim, or set-off, of appellant, and to permit further proof upon the issues indicated above, and render a decree not inconsistent with this opinion.

SMITH, J., (concurring). I concur in the majority opinion except that portion of it which deals with the right of appellant guaranty company to set-off the deposit paid by it to the life insurance company against the demand of the receiver.

Subrogation is of two kinds, legal and conventional, according to the text-writers. Conventional subrogation arises out of the agreement of the parties, but ordinarily, when the term subrogation is used, legal subrogation is meant; and this is the kind of subrogation with which we are here dealing.

The annotator's note to the case of *American Bonding Co.* v. *National Bank,* 99 Am. St. Reps. 466, constitutes a treatise on this right, covering fifty-nine pages and collects a very great many authorities on the subject. In this note it is there said: "Legal subrogation is not founded upon contract or privity or strict suretyship. It is born of equity, and results from the natural justice of placing the burden where it ought to rest. It does not flow from any fixed rule of law, but rather from principles of justice, equity, and benevolence. It is a purely equitable result, depending like other equitable doctrines upon the facts and circumstances of each particular case to call it forth. It is a device adopted or invented by equity to compel the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it."

This court is thoroughly committed to the proposition that a receiver is not an innocent purchaser. The cases cited in the majority opinion so hold. The receiver takes over the assets of the bank subject to all outstanding equities, and the question for decision is, therefore, what are the equities in regard to the deposit of the life insurance company paid by the appellant guaranty company.

The majority treat the appellant guaranty company as having acquired its rights after the bank became insolvent, and disposes of the claim of subrogation by saying that, if it were allowed, persons could purchase claims of depositors and thus secure preferences. The trouble with this declaration of the law is that it assumes as true the point really in controversy, and that is, that the rights of the guaranty company did not accrue until after the bank became insolvent. It may be freely conceded that, if appellant's right did not accrue until payment was actually made by it, the right of subrogation must be denied as constituting a preference. But just here is where the majority falls into error.

In the case of *Wasco County* v. *New England Equitable Insurance Co.*, L. R. A. 1918-D, 732, the point presented was when the surety's right of subrogation accrued, and in that case, where the court considered the principles involved and the authorities thereon, the court (Supreme Court of Oregon) held that "* * * the right of subrogation dates back to the time when the insurance company entered into the contract of suretyship." In that case, as in this, the surety received compensation for his suretyship, but it was there said that "a court of equity grants the right of subrogation because the surety has paid the debt of the principal, and the right of subrogation is not dependent upon whether the surety was or was not paid to sign the bond."

In 25 R. C. L. page 1328, it is said: "This right of a surety to subrogation stands upon the principles of natural justice. Payment by the surety is deemed equiv-

alent to a purchase from the creditor, and operates as an equitable assignment of the debt, and all its incidents, to the former. It has well been said that in these cases the law creates or implies a contract on the part of the creditor that such property or securities will be turned over to the one who is secondarily liable as soon as he pays the creditor's claim. The right of a surety to subrogation begins with the contract of suretyship, and is not simply inchoate until he pays the debt."

In Michie on Banks & Banking, vol. 2, p. 1073, sec. 135, it is said: "Where a party executes a guaranty for the payment of sums deposited in a bank to which he is indebted, which sums are due and payable at the time of the bank's suspension, equity will give him credit on his indebtedness for the payments made because of the bank's failure to do so, whether he is regarded as a surety, and becomes subrogated to the rights and claims of the depositors, or simply that by the bank's failure and default he became liable for such sums. Where such guarantor owed certain notes to the bank, which became due before a receiver was appointed for such bank, but owing to the time required to fix plaintiff's liability, he did not pay the creditors for some time after suspension, that claim will be deemed to relate back, and to have been made at the time of suspension, and the amount so paid may be set-off against the notes held by the bank against plaintiff."

It is not necessary, however, that we should search beyond our own decisions to determine when the right of surety attaches, as this court decided that question in the case of *Griffin* v. *Long*, 96 Ark. 271, where it is said: "The principal thus becomes indebted to the surety for the payments he is compelled to make for the former, and the question which arises is, does such indebtedness have its inception from the time the party became surety or from the time payment is made by the surety? The true rule seems to be that the surety becomes a creditor of the principal at the time he signs the note as surety,

and not at the time he pays the same. In the case of *Wiggin* v. *Flower*, 5 Rob. (La.) 406, it is said: 'Though the obligation of a surety cannot be enforced till after the event on. which it becomes absolute, it exists from the time it was contracted, so the rights of the surety against his principal exist before the obligation of the former becomes absolute.' " See also *McDonald* v. *Mueller*, 123 Ark. 226.

It required payment of this deposit by the guaranty company to the insurance company to make the right of subrogation enforceable, but when payment was made —and it has been made—the guaranty company was put in the shoes of the insurance company, and has all the rights against the receiver which are incident to the ownership of that deposit, and it has therefore the right to set-off this deposit, which, in equity, became the property of the guaranty company, upon payment thereof, against the demand of the receiver. In other words, the guaranty company has the same right of set-off it would have had had the deposit been in its own name at the time the bank closed its doors, because, by subrogation, it is given the rights which the insurance company itself would have had had the receiver asserted some demand against appellant's surety company. *Funk* v. *Young*, 138 Ark. 38.

Justice Hart concurs in the views here expressed.